Filed 5/27/25

**CERTIFIED FOR PUBLICATION**


IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT


| | |
|---|---|
| OGEN PERRY et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>WILLIAM R. STUART et al.,<br><br>    Defendants and Appellants. | H051093<br>(Santa Clara County<br>Super. Ct. No. 21CV386331) |
| DAHLEX LP et al.,<br><br>    Plaintiffs and Appellants,<br><br>    v.<br><br>MILESTONE FINANCIAL LLC et al.,<br><br>    Defendants and Appellants. | H051955<br>(Santa Clara County<br>Super. Ct. No. 21CV386331) |


These appeals and cross-appeals involve a demand for corporate records under the California Revised Uniform Limited Liability Company Act.  (Corp. Code,[1] § 17701.01 et seq.).

---

[1] All further unspecified statutory references are to the Corporations Code.

Husband and wife Ogen and Dorit Perry,[2] individually and together with their California limited partnership, Dahlex LP (Dahlex) (collectively, the Perrys), petitioned for a writ of mandate to compel Milestone Financial LLC and its former and current managers, Bear Bruin Ventures, Inc. and William R. Stuart, respectively (collectively, Milestone), to produce and provide for inspection of Milestone's member list and other corporate records under sections 17704.10, subdivisions (a) and (b) and 17701.13.

The trial court in a written order granted the Perrys' petition in part (writ order). It ordered disclosure of some of the corporate records requested by Dahlex but ordered the redaction of member names and addresses from Milestone's member list after finding the list to be a protected trade secret and decided Milestone need not produce audited records. In a separate written order, the trial court granted in part the Perrys' request for attorney fees and costs (fee order).

In case No. H051093, Milestone appeals the writ order on the grounds that the Perrys lacked standing to bring the action, Dahlex's request for the records did not meet the standard set out in section 17704.10, subdivision (a), and the trial court's redaction order should have included other documents in addition to the member list. The Perrys cross-appeal, arguing that the court erred in ordering redaction of member names and addresses because the member list is not a trade secret, the court should not have applied the trade secret statute to documents falling under section 17704.10, and the court erred in declining to order the production of audited records.

In case No. H051955, the Perrys appeal the fee order on the grounds that the fee order did not accurately reflect the findings in the writ order and

---

[2] For clarity, when referencing them individually, we refer to the Perrys by their first names.

the court abused its discretion in reducing the attorney fees and costs they sought. Milestone cross-appeals, contending that the court did not make sufficient findings under section 17704.10 to support the fee award.

For the reasons stated below, we direct the trial court to revise the writ order and judgment to state that Milestone is ordered to provide the information required to be maintained in section 17701.13, subdivision (d)(6) accompanied by the report or certificate, as applicable, specified in section 17704.10, subdivision (c)(3). We also reverse the fee order and remand for reconsideration by the trial court of the calculation of attorney fees. We otherwise affirm the judgment.

## I. FACTS AND PROCEDURAL BACKGROUND[3]

*A. Facts*

Ogen and Dorit Perry are general partners of Dahlex LP, a California limited partnership.[4] Dorit owns a Roth IRA account for which she "make[s]

---

[3] We take these facts from the Perrys' petition for writ of mandate (petition) and the parties' filings submitted in the trial court in connection with the petition, amended petition (defined *post*), and motion for attorney fees and costs. "We recite the essential relevant facts 'in the manner most favorable to the judgment, resolving all conflicts and drawing all inferences in favor of respondent.' " (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1233, fn. 2; *Haydon v. Elegance at Dublin* (2023) 97 Cal.App.5th 1280, 1287.) Both parties submitted evidentiary objections to the trial court, and we disregard any evidence to which the court sustained an objection.

[4] A limited partnership "can generally be described as a type of partnership comprised of one or more general partners who manage the business and who are personally liable for partnership debts, and one or more limited partners who contribute capital and share in the profits, but who take no part in running the business and incur no liability with respect to partnership obligations beyond their capital contribution." (*Evans v. Galardi* (1976) 16 Cal.3d 300, 305.) Under the Uniform Limited Partnership Act of 2008 (§ 15900 et seq.), "[e]ach general partner has equal rights in the management and conduct of the limited partnership's activities" (§ 15904.06,

all the decisions" with Ogen's assistance.  Ogen is the primary beneficiary of Dorit's Roth IRA account.  Ogen invests and manages the Perrys' funds, including those of Dahlex and Dorit's Roth IRA account.

Milestone is a limited liability company[5] that is a " 'finance lender' and 'broker' " (capitalization omitted), engaged "in the business of making and acquiring non-consumer loans on residential and commercial real property." Milestone offers "[m]embership [i]nterests which represent a financial interest in existing and future trust deed loans" owned by Milestone. Milestone's private placement memorandum (memorandum) indicates that, as of March 1, 2015, "Bear Bruin Ventures, Inc., a California corporation doing business as 'Page Mill Funding,' " was the manager of Milestone and that William R. Stuart was Bear Bruin's president.  Stuart later replaced Bear Bruin as Milestone's manager.

In 2016, Ogen signed a "Basic Investment Provisions & Operating Agreement" (some capitalization & boldface omitted) (the operating agreement) with Milestone and invested $250,000 in Milestone on behalf of Dahlex.  Dahlex became a member of Milestone on August 1, 2016.  In January and November 2017, Ogen on behalf of Dahlex made two additional investments of $100,000 each in Milestone.

---

subd. (a)), and the "limited partnership shall reimburse a general partner for payments made and indemnify a general partner for liabilities incurred by the general partner in the ordinary course of the activities of the partnership or for the preservation of its activities or property."  (*Id*., subd. (c).)

   [5] " ' "A limited liability company is a hybrid business entity formed under the Corporations Code and consisting of at least two 'members' [citation] who own membership interests [citation].  The company has a legal existence separate from its members.  Its form provides members with limited liability to the same extent enjoyed by corporate shareholders [citation], but permits the members to actively participate in the management and control of the company." ' "  (*Sirott v. Superior Court* (2022) 78 Cal.App.5th 371, 381.)

4

Under the terms of the operating agreement, Milestone's members "may withdraw as a [m]ember of [Milestone] and may receive a return of capital effective upon the last day of a calendar quarter, provided that each of the following conditions have been met: (a) the [m]ember has been a [m]ember of [Milestone] for a period of at least 60 months, and (b) the [m]ember provides [Milestone] with a written request for a return of capital . . . at least one hundred (100) days prior to a calendar quarter end — 3/31, 6/30, 9/30 or 12/31." Therefore, under the operating agreement, the earliest Dahlex could receive a return of its capital was August 1, 2021.

Milestone states that it "will use its best efforts to honor requests for a return of capital subject to, among other things, [Milestone]'s then existing cash flow, financial condition, and prospective real estate investments" and that "[w]ithdrawal requests will be considered on a first come basis." The operating agreement provides for maintenance of certain corporate records and for limited inspection of records by members.

Milestone's memorandum outlines the company's "proposed business, operations, and financial condition" as well as other disclosures, including risks, regarding the investment opportunity Milestone offers to prospective investors. When a prospective investor enters into an operating agreement with Milestone, it acknowledges that, in the event of any conflict between the terms of the operating agreement and those of the memorandum, those of the memorandum control.

The memorandum sets forth the process by which Milestone makes quarterly cash distributions: "Each quarter, the [m]anager will first pay expenses of the LLC as well as the amounts due and payable to the [n]ote [h]olders. The [m]anager will then distribute the LLC's accrued [n]et [p]rofits to the [m]embers up to a 7.5% per annum, cumulative return, together with

5

20% of the [n]et [p]rofits over the 7.5% return. The exact amount of [n]et [p]rofits accrued at any point in time may be more or less than the amount distributed and may, in some cases, result in a return of capital. As among [m]embers, [n]et [p]rofits will be distributed to each [m]ember in proportion to the value of their capital accounts compared to the total value of all capital accounts."

The memorandum provides that members may withdraw from Milestone and receive a return of their invested capital if they meet the following conditions: "(a) the [m]ember has been a [m]ember of [Milestone] for a period of at least 24 months; and (b) the [m]ember provides [Milestone] with a written request for a return of capital at least 65 days prior to such withdrawal." These timeframes are shorter than those set forth in the operating agreement—under the memorandum, the earliest Dahlex could receive a return of its capital was August 1, 2018.

The memorandum, like the operating agreement, states that Milestone will "use its best efforts to honor" such requests for return of capital, though its efforts will be "subject to, among other things, [Milestone]'s then existing cash flow, financial condition, and prospective loans." Although Milestone's manager has the "absolute discretion" to "accelerate withdrawal[] payments in the case of undue hardship," the memorandum notes that the manager has "no legal or fiduciary duty to do so" and "[o]therwise withdrawal requests will be considered on a first come basis." In addition, the memorandum states that "[f]inancial statements [*sic*] reports concerning [Milestone]'s business affairs will be provided to [m]embers, on request."

In May 2019, Ogen contacted Stuart to notify Milestone of an upcoming need to withdraw "some or all of" the funds from Dahlex's investment in Milestone "due to a potential need for cash."

6

On May 29, 2019, Ogen e-mailed Stuart to inform him that Ogen was starting the process of making investments from Dorit's Roth IRA account to "substitute[e] for money in the Dahlex account." On June 13, 2019, Dorit, in her capacity as owner and beneficiary of her Roth IRA account, signed an operating agreement with and invested $250,000 in Milestone.[6] The operating agreement was substantially the same as the one Ogen signed on behalf of Dahlex. In June 2019, the Perrys invested additional funds from Dorit's Roth IRA account in Milestone, for a total of $440,000. Dorit declared that she transferred funds from her Roth IRA account to Milestone for the purpose of "enabl[ing] Milestone to free up funds through a partial redemption of the Dahlex account."

The need for cash Ogen anticipated in May 2019 materialized in March 2020. That month, Ogen called Stuart multiple times to discuss the withdrawal of $200,000 from Dahlex's investment in Milestone. Ogen contended that Stuart did not accept his calls or respond to his voicemail messages.

On March 20, 2020, in an e-mail exchange between Ogen and Stuart, Ogen stated, "When I made the investment out of Dorit's IRA account, we agreed it was substituting for my earlier investment which I would be pulling out in short order. The capital call got delayed a bit but it does not change the original intent." Stuart responded, "My understanding was you wanted [the] right to move $ between those two accounts and I am ok with that."

---

[6] The member signature is not visible on the operating agreement between Dorit's Roth IRA account and Milestone, but neither party questions its validity. The operating agreement indicates an initial investment of $150,000. However, spreadsheets provided by Milestone indicate Dorit's Roth IRA account invested $250,000 on June 13, 2019.

That same day,[7] Ogen and Stuart spoke on the phone and Ogen threatened to report Stuart "to the FBI and the SEC."

Beginning on July 15, 2020, Milestone began making payments from the Dahlex account for investment returns and capital redemptions. Ogen asserted that Milestone did not commit to a payment schedule or provide notice of upcoming payments.

In February 2021, Ilan Raab, then a member of Milestone, requested to withdraw the entirety of his Milestone investment of $250,000. That same day, Stuart e-mailed Ogen asking to speak about Raab. Ogen asserted that, when he and Stuart spoke, Stuart asked Ogen to persuade Raab not to proceed with the withdrawal request and conditioned redemption of Dahlex's investment on Ogen succeeding in this task or at least delaying Raab's request "for a substantial period of time." Stuart disputed this assertion. Ogen spoke with Raab and subsequently e-mailed Stuart to let him know that Raab was "not interested in an extended withdrawal." Raab received a check from Milestone for the full amount of his investment, plus interest, on April 22, 2021.

In April 2021, Ogen e-mailed Stuart to inform him that Ogen had received "a very large capital call" and to ask "[h]ow much money [Milestone] could [] free up in the near term[]." Stuart responded on April 20, 2021, saying "[n]o more for a while." According to a Milestone spreadsheet, between July 2020 and May 2021, Milestone redeemed $140,000 of Dahlex's $450,000 investment.

---

[7] It is unclear whether the phone call took place before or after the e-mail exchange.

8

On May 27, 2021, Ogen e-mailed Stuart to ask how much redemption he could "expect along with the Q2 distribution," and Stuart responded that there would not be any.

On June 2, 2021, the Perrys' counsel, Rony Sagy, sent Milestone a written request to withdraw all the funds invested by Dahlex and sent a second written request on June 9, 2021. In the second letter, Sagy also requested Milestone "[r]eport if other [m]embers submitted requests to withdraw prior to June 2, 2021, which request(s) remain unfulfilled" and "[i]n the event there are [m]embers with pending earlier requests for withdrawal, please provide a report outlining for each such request, the withdrawal notice date, the amount sought, and the date Milestone anticipates to release the funds." Milestone did not respond to these requests.

On June 17, 2021, Sagy sent Milestone a demand for information pursuant to section 17704.10, in which Dahlex demanded production of certain documents and information and the provision for inspection of other documents. On June 18, 2021, Sagy sent by mail and e-mail another letter to Milestone identifying the specific types of records Dahlex anticipated receiving in response to the June 17, 2021 letter.

Dahlex requested Milestone provide the following: a list of Milestone's current members' names, addresses, contributions, and share in profits and losses; a list of the current managers' names and addresses; and copies of Milestone's federal, state, and local tax returns for the past six years. Dahlex also requested that Milestone allow inspection of its financial statements for the past six fiscal years, and its books and records regarding its internal affairs for the current and past four fiscal years.

Dahlex's June 18, 2021 letter clarified that the financial statements Dahlex sought included the past six years of "Milestone's profit and loss

statements, its balance sheets and cash flow summaries;  [¶]  [r]ecords of the loan loss reserve's reconciliation; and  [¶]  [r]ecords of all capital redemptions requested by any [m]ember since March 20, 2020, including records containing the following details: the identity of the [m]ember requesting redemption; the date(s) the [m]ember requested withdrawal of part or all of its capital; the amount requested to be withdrawn; and the amount and date of the redemption, if any."  In addition, Dahlex clarified that the "books and records regarding [Milestone]'s 'internal affairs' " it expected to receive included the past four years of "[r]ecords reflecting all payments made by Milestone to Bear Bruin Ventures, Inc. dba Page Mill Funding, [Stuart], [Stuart's] wife, and/or any other entity in which either [Stuart] or [Stuart's] wife has a stake; and  [¶]  [r]ecords of loans made by Milestone since March 20, 2020, including records containing the following details: the name of the borrower, the amount of each loan, its duration, the applicable interest rate and the address of the real property securing the loan."

Milestone's "delayed and incomplete response" to the withdrawal request for Dahlex, together with Milestone's return of Raab's entire investment within two months, prompted Ogen to scrutinize quarterly reports he received from Milestone on Dahlex's behalf.  Ogen asserted he had concerns about Milestone's financial condition and management that prompted his document production and inspection request to Milestone. Ogen listed among his concerns the following:  incorrect information regarding Dahlex's average daily balance of funds, payment of manager income in an amount greater than the sum of the members' investment returns, potential underpayment to Dahlex, the size of the loan loss reserve, and unexplained expenses.

10

On July 19, 2021, Sagy e-mailed Stuart to reiterate Dahlex's request for information pursuant to section 17704.10, to clarify that the request was also made on behalf of Dorit's Roth IRA account, and to note that they would file a petition for writ of mandate on July 26, 2021, should Milestone fail to comply with the request on or before July 23, 2021. Milestone did not comply with the request.

### B. Procedural Background

#### 1. Petition for Writ of Mandate; Writ Order (No. H051093)

On July 26, 2021, Ogen, Dorit, and Dahlex filed a petition to compel the production of records pursuant to section 17704.10, subdivision (a) and to compel Milestone to permit inspection pursuant to section 17704.10, subdivision (b). The Perrys asserted that under section 17704.10 Milestone had "a clear and present legal duty to promptly produce and/or make available for inspection within a reasonable time" the records they had reasonably requested and had unjustifiably failed to comply with the request. The Perrys requested, among other relief, a peremptory writ of mandate pursuant to Code of Civil Procedure section 1085, subdivision (a), commanding Milestone to produce the requested records and permit the Perrys or their counsel to inspect and copy such records.

In its opposition, Milestone argued that Ogen and Dorit lacked standing to bring the petition; Milestone returned over $200,000 of the Perrys' capital to them between June 30, 2020, and June 30, 2021; and the Perrys lacked a proper purpose for requesting the documents and information under section 17704.10. Milestone asserted the Perrys' intent was to "[d]isrupt[] the ordinary and orderly operation of Milestone" (underscoring & boldface omitted) and "an attempt to arrange a coup against Milestone" by

11

"pressur[ing Milestone] into returning capital [while] ignoring the express terms of the [operating] agreement."

On September 1, 2022, the Perrys filed an amended petition for writ of mandate to compel the production of records and permit inspection pursuant to section 17704.10, subdivision (b) (amended petition).[8] The amended petition was substantively the same as the original petition, but it extended the deadline for production of documents and requested that the trial court include in its peremptory writ of mandate a finding that Milestone's failure to comply with section 17704.10 was without justification and, thus, entitled the Perrys to " 'reasonable expenses . . ., including attorneys' fees.' "

Milestone answered the amended petition, asserting various affirmative defenses. It also filed an opposition, which reiterated the arguments made in its opposition to the original petition. In addition, Milestone argued there was no evidence that it improperly managed member accounts, and its member list is a trade secret, the revelation of which is not supported by any proper purpose. Milestone argued that if the trial court ordered the production of the member list, it should require the redaction of names, addresses, and other contact information.

In support of Milestone's trade secret argument, Stuart asserted that he "had to invest time, money and effort to find the people willing to" invest in Milestone, and "Milestone makes an effort to maintain the confidentiality

---

[8] In 2021 and 2022, the Perrys and Milestone engaged in arbitral proceedings, but these were terminated prior to completion. Thereafter, the parties returned to the trial court. Milestone initially successfully compelled arbitration of the dispute but later did not oppose the Perrys' request to terminate the arbitral proceedings on the basis of Milestone's failure to pay arbitral fees. Milestone later represented to the trial court that it considered the arbitral fees to be "excessive." The Perrys had paid their share of the arbitral fees prior to Milestone's decision to terminate arbitration.

of its investor/member list" because it "is a trade secret" and "is not publicly available." He noted that access to the list is limited to those with "a need to know" and all such persons with access "agreed to keep it confidential and understand it is [a] trade secret." He contended that "[i]f the list were to be provided to Milestone's competitors, they would save all the money, time and effort required to find people willing to make this unique investment and would save the thousands of hours invested over time by Milestone to make the list and market, advertise and solicit people to obtain the investors."

On October 27, 2022, the trial court conducted a hearing and requested and received supplemental briefing from the parties.[9]

Milestone sent Dahlex a check dated December 31, 2022, for $2,624.87 for Dahlex's "final distribution from Milestone's earnings." In addition, Milestone issued a check to Dahlex, dated January 11, 2023, for $130,000, which Stuart stated was the remainder of Dahlex's "share of the earnings from its investment in Milestone for the quarter ending December 31, 2022."

On May 1, 2023, the trial court issued an order granting in part and denying in part the amended petition.[10] The court found that Dorit (as owner of her Roth IRA account) and Dahlex had standing, and Ogen's individual standing was "not relevant." The court concluded that, even if Milestone had fully redeemed Dahlex's investment, Dahlex retained standing and its requests to Milestone were not moot. The court further found that, even if Dahlex's requests were rendered moot by the full redemption of its investment, Dorit remained entitled to the production and inspection of the requested documents.

---

[9] The hearings in this matter were not reported.
[10] A different bench officer than the bench officer who had presided over the earlier hearings issued the writ order.

On the merits of the record request, the trial court determined that Dahlex's and Dorit's Roth IRA account's request for the documents and information were for "a purpose reasonably related" to their interest in their investments in Milestone. The court grounded its conclusion on the following findings: (1) Milestone's failure to "handle their request for redemption on a 'first come basis' " in accordance with the operating agreement and memorandum; (2) if Milestone's redemption decision was based on its " 'then existing cash flow, financial condition, and prospective real estate investments,' " the Perrys reasonably would have an interest in understanding the impact of those factors at the time of their redemption requests; and (3) the Perrys had "established that there are sufficient open questions as to the rate of return on their investments relative to retention of profits and payment of management fees, and the increases in operating expenses and professional fees."

Although the trial court found troubling Ogen's "threats to report Milestone to the FBI and/or the SEC," it determined there was sufficient "good cause purposes" reasonably related to Dahlex's and Dorit's Roth IRA account's interests in their investments in Milestone to support the request for production and inspection of some of the requested documents. The court also found that the Perrys' concerns regarding Milestone's usage and/or funding of loan-loss reserves and tax reporting forms were not reasonably related to their interests, and did not consider these factors in determining whether the Perrys had a reasonably related interest in the documents and information.

Turning to the requested documents and information, the trial court granted the Perrys' request for the production and inspection of the following documents and information:

14

(1) "A current list of the full name and last known business or resident address of each member and of each transferee set forth in alphabetical order, together with the contribution and the share in profits and losses of each member and transferee" (underscoring omitted), provided that Milestone redact the names and addresses of the members and transferees;

(2) "a current list of the full name and business address of each manager" of Milestone (underscoring omitted);

(3) copies of Milestone's "federal, state, and local income tax or information returns and reports, if any, for the six most recent fiscal years" (underscoring omitted);

(4) copies of Milestone's financial statements, "if any, for the six most recent fiscal years" (underscoring omitted); and

(5) Milestone's books and records related to its internal affairs "for at least the current and past four fiscal years" (underscoring omitted).

The trial court ordered Milestone to redact member and transferee names and addresses from the member list because it found that the list of Milestone members and transferees was a protectable trade secret under Civil Code section 3426.1.  The court based its conclusion on its findings that the list was not generally known to the public and Milestone had taken reasonable steps to maintain its secrecy.  The court declined to order that the requested documents be audited or signed by accountants because of a lack of legal authority mandating these requirements.

The trial court also found no basis to order and declined to order the production of the specific documents sought by Dahlex under section 17701.13, subdivision (d)(7), including "[t]he past four years of records reflecting all payments made by Milestone to its management, including Respondent Bear Bruin Ventures, Inc. dba Page Mill [F]unding, Stuart,

15

Stuart's wife, and/or any entity in which either Stuart or Stuart's immediate family members have a stake," and denied this request "[t]o the extent these documents are not already included in the documents ordered to be provided or made available for inspection."

2. Appeal of Writ Order (No. H051093); Peremptory Writ; Proposed Judgment

On May 19, 2023, Milestone appealed the trial court's May 1, 2023 order granting in part and denying in part the Perrys' amended petition (writ order).

On May 22, 2023, the Perrys filed a proposed judgment and a proposed peremptory writ of mandate based on the writ order. The following day, Milestone objected to both the proposed judgment and the proposed peremptory writ of mandate.[11]

---

[11] On April 22, 2024, the Perrys filed in this court a motion to augment and/or request for judicial notice to add a June 22, 2023 e-mail from Sagy to Milestone in which the Perrys suggested (without waiving their objections to Milestone's trade secret arguments) a partial redaction protocol for documents produced pursuant to the writ order. The June 22, 2023 e-mail was not before the trial court when it issued the writ order. (See *In re Kenneth D.* (2024) 16 Cal.5th 1087, 1106.) Moreover, we may not take judicial notice of the truth of any facts asserted in the e-mail (*ibid.*), and we decide the e-mail is irrelevant to the issues before us. (*People ex rel. Lockyer v. Shamrock Foods Co.* (2000) 24 Cal.4th 415, 422, fn. 2.)

The Perrys also seek to augment the record with a copy of an October 17, 2023 e-mail from Sagy to the trial court requesting entry of judgment following the writ order. As discussed in greater detail *post* (pt. I.B.2.), on November 19, 2024, this court ordered the trial court to enter judgment on the writ order. We decide the Perrys' request with respect to this e-mail is moot.

The Perrys request this court take judicial notice of the fee order. We do not rely on the fee order to evaluate the writ order. The writ order is clear on its face, as discussed *post* (fn. 24).

For these reasons, we deny the Perrys' April 22, 2024 request for judicial notice.

On August 30, 2023, the clerk of the superior court filed a peremptory writ of mandate in accordance with the writ order.[12]

In its fee order, discussed in greater detail *post* (pt. I.B.1.c.), the trial court declined to enter judgment, relying on *Meinhardt v. City of Sunnyvale* (2022) 76 Cal.App.5th 43, reversed, which had held that "an order granting or denying a petition for writ of mandate in its entirety, when such order contemplates the taking of no further action in the case, concludes the special proceeding of a civil nature.  As such, it is properly considered a final judgment." (*Id.* at p. 66.)

### 3. Request for Attorney Fees and Costs; Fee Order; Appeal of Fee Order (No. H051955)

On June 29, 2023, the Perrys filed a motion seeking $165,343.84 in attorney fees and costs, comprised of (1) $156,694.50 in attorney fees representing 439.29 hours worked at a rate of $450 per hour, and (2) $8,649.34 in costs.[13]  The Perrys argued that Milestone's failure to comply with the request for production and inspection of documents pursuant to section 17704.10 was without "legally cognizable justification."  The memorandum of costs submitted by the Perrys included a request for $958 in

---

[12] Milestone filed a motion to augment the record with the trial court's peremptory writ of mandate.  We grant Milestone's request.

[13] According to the fee order, Milestone filed a motion to tax costs on November 13, 2023.  The parties did not include the motion to tax costs in the record on appeal.

In addition, as noted in the fee order, the Perrys sought additional fees and costs incurred after the issuance of the writ order.  The Perrys' total updated request for attorney fees and costs was $192,336.14, comprised of $181,327.50 in attorney fees and $11,008.64 in costs.  The record does not indicate the number of attorney hours the updated attorney fee amount represents.  Although the fee order states that Sagy did not charge the Perrys for 110.94 attorney hours, it is not clear how many of the discounted hours were incurred before the issuance of the writ order.

17

costs to cover "[c]ourt-ordered transcripts." Sagy's bills provided by the Perrys included charges for "[r]esearch [o]nline [l]egal [d]atabases" per month (without further detail regarding the issues researched) and unspecified filing fees.

Milestone opposed the motion, arguing that the Perrys are entitled to attorney fees only " 'if the court finds the failure of the limited liability company to comply with the requirements of [section 17704.10] is without justification" and, since the trial court made no such finding, it should not award fees to the Perrys. (Boldface omitted.) In the alternative, Milestone maintained that, even if the trial court were to award attorney fees to the Perrys, such fees should be limited to the period after the October 27, 2022 hearing during which the court requested the parties submit supplemental evidence. Milestone also contended the attorney fees sought were "unreasonable and inflated" when compared with the attorney fees incurred by Milestone.

On January 31, 2024, the trial court issued an order on the Perrys' motion for attorney fees and costs.[14] The court stated that it neither granted the amended petition in its entirety, nor was its order a " 'split decision.' " It further clarified that it had not determined at the October 27, 2022 hearing when it requested supplemental briefing that the Perrys had not presented sufficient evidence to sustain their burden of proof on the amended petition. Rather, the trial court requested supplemental briefing because arguments raised orally at the hearing "had not been made clearly in the original pleadings."

The trial court found that Milestone was justified in opposing the release of the Milestone members' and transferees' names and addresses and

---

[14] The same bench officer issued the writ order and the fee order.

18

the production of four years of records of payment from Milestone to its management. However, it found that Milestone was not justified in opposing the production of the other documents and information Dahlex sought. It also found that Milestone "did not act in good faith" during arbitration because it moved to compel arbitration and then failed to participate "in any meaningful way." Based on the foregoing, the trial court found that the Perrys were entitled to attorney fees and costs.

The trial court found that "the nature of the litigation was of average difficulty and intricacy . . . and that the [Perrys'] attorneys are experienced and have the skills necessary for the litigation." It also found that Sagy's law firm's billing rate was reasonable and its "use of incurred but uncharged hours" was "very reasonable." However, the trial court found that the amount of fees and costs was "in some areas unreasonable." The court observed that the Perrys' "pleadings were often unnecessarily lengthy, and left the court with the challenge of discerning the heart of [their] claims," and found some of the Sagy law firm's billing statements included unidentifiable and unexplained fees and charges, including unexplained costs for transcripts (there were no court reporters for any of the proceedings in the case)..

The trial court concluded that reasonable attorney fees and costs amounted to $65,000, which it indicated "specifically includes all fees relating to arbitration." It determined that "costs can be established for and should be awarded in the amount of $466.16 for filing fees, $60.00 filing fee for the [m]otion, and $175.02 [service of process fees] not challenged by [Milestone]."

On March 25, 2024, the Perrys appealed the trial court's January 31, 2024 order granting in part their motion for attorney fees and costs.  On April 15, 2024, Milestone filed a cross-appeal.[15]

4.  Entry of Judgment; Cross-appeal of Writ Order (No. H051093)

On November 19, 2024, after reviewing supplemental briefing from the parties, this court issued an order deciding that, pursuant to *Meinhardt v. City of Sunnyvale* (2024) 16 Cal.5th 643, Milestone had prematurely filed its appeal in case No. H051093 because the trial court had not yet entered judgment following the writ order.  (*Id*. at p. 650 [holding that the time to appeal begins "with entry of 'judgment' or service of notice of entry of 'judgment,' rather than with the filing of, or service of notice of the filing of, an 'order,' minute order, or other ruling"].)  By extension, the appeal and cross-appeal in case No. H051955 were also prematurely filed.  This court's order directed the trial court to enter judgment in case No. 21CV386331 and authorized the Perrys to file a cross-appeal of the writ order in case No. H051093.

On November 22, 2024, the trial court entered judgment on the writ order and the fee order.[16]  Pursuant to this court's November 19, 2024 order, Milestone's appeal in case No. H051093 was deemed an appeal from the entered judgment (Code Civ. Proc., § 904.1, subd. (a)(1)), and the Perrys' appeal and Milestone's cross-appeal in case No. H051955 were deemed appeals from an order made after an appealable judgment (*id*., subd. (a)(2)).

---

[15] Milestone's notice of cross-appeal does not appear in the clerk's transcript.  On our own motion, we take judicial notice of Milestone's cross-appeal, filed on April 15, 2024.

[16] On January 9, 2025, the Perrys filed a request for judicial notice asking this court to take judicial notice of this court's November 19, 2024 order and the trial court's November 22, 2024 judgment.  We grant the Perrys' request and take judicial notice of both documents.

The appeal in case No. H051093 and the appeal and cross-appeal in case No. H051955 were deemed filed as of the date of entry of judgment, November 22, 2024.

On December 11, 2024, the Perrys filed a notice of cross-appeal of the writ order in case No. H051093.[17]

## II. DISCUSSION

### A. *Standing*

#### 1. Factual and Legal Background

##### a. Arguments on Appeal

Milestone argues that Ogen and Dorit lack standing to seek relief under section 17704.10 because they are not Milestone members. Milestone maintains that, although Dahlex was a Milestone member, once it redeemed its capital investment, it ceased being a member. It asserts that only Dorit's Roth IRA account, which is not a party, is still a member of Milestone.

The Perrys contest Milestone's arguments regarding standing with respect to Dorit and Dahlex but do not address Milestone's contentions with respect to Ogen.

##### b. Statutory Background

"Where as here, an action is entirely statutory and a particular statute specifies who may maintain an action, ' "[i]t is necessary . . . to bring the action in the name of the person to whom the right to sue is given by statute, regardless of any question as to the real party in interest." ' [Citation.] This principle is reflected in Code of Civil Procedure section 367, which provides,

---

[17] On December 23, 2024, Stuart and Milestone filed a notice of cross-appeal and an accompanying designation of the record in both cases. We issued an order striking both documents from our docket as both unnecessary and unauthorized under our November 19, 2024 order.

21

'Every action must be prosecuted in the name of the real party in interest, *except as otherwise provided by statute.*' " (*IBM Personal Pension Plan v. City and County of San Francisco* (2005) 131 Cal.App.4th 1291, 1302; *River's Side at Washington Square Homeowners Assn. v. Superior Court* (2023) 88 Cal.App.5th 1209, 1225–1226.) "The prerequisites for standing to assert statutorily-based causes of action are determined from the statutory language, as well as the underlying legislative intent and the purpose of the statute." (*Boorstein v. CBS Interactive, Inc.* (2013) 222 Cal.App.4th 456, 466 (*Boorstein*).)

The pertinent statute in this action is the California Revised Uniform Limited Liability Company Act (the Act) (§ 17701.01 et seq.). It provides that "a manager" of a limited liability company "shall promptly deliver . . . a copy of the information required to be maintained by paragraphs (1), (2), and (4) of subdivision (d) of [s]ection 17701.13" "[u]pon the request of a member" of the limited liability company "for purposes reasonably related to the interest of that person as a member." (§ 17704.10, subd. (a).) Any such request "by a member . . . may be made by that person or by that person's agent or attorney." (*Id*., subd. (i).)

Under the Act, " '[m]ember' " is defined as "a person that has become a member of a limited liability company under [s]ection 17704.01 and has not dissociated under [s]ection 17706.02." (§ 17701.02, subd. (p).) The Act defines a " '[p]erson' " as "an individual, partnership, limited partnership, trust, a trustee of a trust, . . . estate, association, corporation, limited liability company, or other entity, whether domestic or foreign." (*Id*., subd. (v).)

"Standing is a question of law that courts typically review de novo. [Citation.] To the extent the standing determination is based on underlying factual findings, we review those findings of the trial court for substantial

evidence." (*Loeber v. Lakeside Joint School Dist.* (2024) 103 Cal.App.5th 552, 570; *San Luis Rey Racing, Inc. v. California Horse Racing Bd.* (2017) 15 Cal.App.5th 67, 73.)

    2. <u>Analysis</u>

Because the causes of action in the Perrys' amended petition are based on section 17704.10, we must examine the statute to determine standing. (*Boorstein*, *supra*, 222 Cal.App.4th at p. 466.)

"We begin as always with the statute's actual words, the 'most reliable indicator' of legislative intent, 'assigning them their usual and ordinary meanings, and construing them in context.' " (*Even Zohar Construction & Remodeling, Inc. v. Bellaire Townhouses, LLC* (2015) 61 Cal.4th 830, 837–838.) " 'If the words themselves are not ambiguous, we presume the Legislature meant what it said, and the statute's plain meaning governs.' " (*Id.* at p. 838.)

Under section 17704.10, subdivision (i), the request for a limited liability company's records pursuant to section 17704.10, subdivision (a), may be made by a member "or by that person's agent or attorney." The member may enforce its rights by bringing an action. (*Id.*, subd. (f).)

On June 17, 2021, Sagy sent, on her client Dahlex's behalf, the letter to Milestone stating its request for information under section 17704.10. On July 26, 2021, because Milestone had not provided the requested documents, Dahlex—together with its general partners, Ogen and Dorit—filed its petition for writ of mandate to enforce its rights under section 17704.10, which they amended on September 1, 2022. Milestone asserts that Dahlex's investment was redeemed in January 2023, after Milestone had paid the "final distributions" to Dahlex in December 2022 and the "share of the

earnings from its investment in Milestone for the quarter ending December 31, 2022" in January 2023.

Whether or not Dahlex is currently a member of Milestone, it is undisputed that Dahlex was a member of Milestone at the time its attorney made the original request and at the time Dahlex filed both the petition and the amended petition seeking to enforce its rights under section 17704.10. The Act does not state that a limited liability company member loses its right to request documents under section 17704.10 if it ceases being a member after making such a request. Nor does Milestone identify any language in the statute that supports such a reading.[18] Indeed, the Act does not include amongst the effects of dissociation a loss of the right to request corporate records under section 17704.10 or otherwise cross-reference that provision. (§ 17706.03.)

The amended petition before us is intended to enforce Dahlex's rights under section 17704.10. If we were to agree with Milestone's argument, a limited liability company could avoid its obligations under the Act by simply refusing to fulfill a member's section 17704.10 request until it has redeemed the entirety of the member's investment and distributions, and then declare the request moot. We decide that Dahlex has standing.[19]

---

[18] The operating agreement states that, in the event of a member's dissociation from Milestone, its "right to . . . receive information concerning [Milestone]'s affairs and inspect [Milestone]'s books and records will terminate." However, the Act expressly states that the terms of operating agreements shall not take precedence over the terms of the Act. (§ 17701.10, subd. (d)(2) ["[T]he operating agreement shall not . . . [¶] . . . [¶] [v]ary a member's rights under [s]ection 17704.10."]; § 17704.10, subd. (h) ["Any waiver of the rights provided in this section shall be unenforceable."].)

[19] Because we decide that Dahlex has standing, we do not reach the issues of whether Ogen and Dorit have standing and whether Dahlex is currently a member of Milestone. In its cross-appeal of the fee order,

## B. Section 17704.10 Request

### 1. Factual and Legal Background

#### a. Arguments on Appeal

Milestone contends that the trial court erred in granting Dahlex's request for the production and inspection of Milestone's corporate documents because the record lacks substantial evidence that Dahlex made its request for a proper purpose. Milestone further asserts that the trial court's redaction order was too narrow because it was limited to the redaction of the member names and addresses from Milestone's member list. It argues that the member names and content information are trade secrets, whether they appear in Milestone's member list or elsewhere, and, thus, should be redacted in all the records ordered produced.

The Perrys maintain that substantial evidence in the record—namely, evidence of Milestone's failure to redeem requests on a " 'first come basis' " and evidence of inconsistencies in Milestone's financial operations that raised questions regarding their impact on the rate of return—supports the trial court's finding that their section 17704.10 request was reasonably related to their interests as Milestone members. They assert that the member list is their "only tool for tracking other members' redemption requests and Milestone's redemption payments." The Perrys contend that Milestone's request for expanded redaction exceeds the scope of the court's finding—that only Milestone's member list was a trade secret—and is not supported by legal authority.

---

Milestone contends that the trial court erred by ordering Milestone to pay attorney fees and costs without specifying the payee(s) because Ogen lacks standing. As we are reversing the fee order and remanding for further proceedings, we do not reach this issue.

On cross-appeal, the Perrys challenge the trial court's direction to redact member names and addresses from the member list as contravening both section 17704.10, subdivision (h) (stating "Any waiver of the rights provided in this section shall be unenforceable") and their right under the terms of the operating agreement to access " 'all' " records. The Perrys also challenge the trial court's finding that Milestone's member list is a trade secret. They contend that production and inspection of the unredacted member list would not involve disclosure to the public but, rather, disclosure only to the Perrys who, as Milestone members, are subject to confidentiality obligations under the operating agreement. Finally, they argue that the trial court erred in declining to order Milestone to have the documents it produces be audited or signed by accountants because the language in section 17704.10, subdivision (c)(3) requires the limited liability company to produce audited reports.[20]

---

[20] In their writ cross-appeal (and in their appeal of the fee order) the Perrys contend that the trial court erred in finding in the fee order "that Milestone was 'justified in opposing the release of the names and addresses of each member and transferee.' " They maintain that the finding in the fee order is overly broad because in the writ order the trial court limited the redaction of names and addresses to those in Milestone's member list. The Perrys argue that, "[t]o the extent the trial court considered the improperly expanded scope of the redactions in making its award [of fees and costs], [the fee order] should be reversed and corrected." The Perrys do not cite to any evidence in the record that supports their argument that the court may have considered any such "expanded" scope in issuing the fee order. Although "[w]e are not required to search the record to ascertain whether it contains support for [the Perrys'] contentions" (*Mansell v. Board of Administration* (1994) 30 Cal.App.4th 539, 545), based on our review, the record does not support the Perrys' claim. The writ order clearly limits the redaction of member names and addresses to Milestone's member list. The fee order, which addresses the Perrys' motion for attorney fees and costs, not their amended petition for writ of mandate, does not alter the scope of the writ order.

26

b.  Corporations Code

The Act addresses in section 17704.10, subdivision (a) members' rights to information:  "Upon the request of a member . . ., for purposes reasonably related to the interest of that person as a member . . ., a manager . . . shall promptly deliver, in writing, to the member . . ., at the expense of the limited liability company, a copy of the information required to be maintained by paragraphs (1), (2), and (4) of subdivision (d) of [s]ection 17701.13, and any written operating agreement of the limited liability company."

The information section 17704.10, subdivision (a) requires the limited liability company to maintain is "(1) A current list of the full name and last known business or residence address of each member and of each transferee set forth in alphabetical order, together with the contribution and the share in profits and losses of each member and transferee.  [¶]  (2) If the limited liability company is a manager-managed limited liability company, a current list of the full name and business or residence address of each manager.  [¶] . . .  [¶]  (4) Copies of the limited liability company's federal, state, and local income tax or information returns and reports, if any, for the six most recent fiscal years."  (§ 17701.13, subd. (d)(1), (2), (4).)

Under section 17704.10, subdivision (b)(1), a member "has the right, upon reasonable request, for purposes reasonably related to the interest of that person as a member" to inspect and copy "any of the records required to be maintained pursuant to [s]ection 17701.13."  Under section 17704.10, subdivision (b)(2), the member has the right to obtain from the limited liability company a written "copy of the limited liability company's federal, state, and local income tax returns for each year."

The information the limited liability company must retain pursuant to section 17701.13 consists of:  "A copy of the articles of organization and all

amendments thereto, together with any powers of attorney pursuant to which the articles of organization or any amendments thereto were executed." (*Id.*, subd. (d)(3).) "A copy of the limited liability company's operating agreement, if in writing, and any amendments thereto, together with any powers of attorney pursuant to which any written operating agreement or any amendments thereto were executed." (*Id.*, subd. (d)(5).) "Copies of the financial statement of the limited liability company, if any, for the six most recent fiscal years." (*Id.*, subd. (d)(6).) "The books and records of the limited liability company as they relate to the internal affairs of the limited liability company for at least the current and past four fiscal years." (*Id.*, subd. (d)(7).)

The financial statements referenced in section 17704.10 "shall be accompanied by the report thereon, if any, of the independent accountants engaged by the limited liability company or, if there is no report, the certificate of the manager of the limited liability company that the financial statements were prepared without audit from the books and records of the limited liability company." (*Id.*, subd. (c)(3).)

c. Standards of Review

The trial court had authority to issue the writ order under section 17704.10, subdivision (f), which provides "In addition to the remedies provided in [s]ections 17713.06 and 17713.07 and any other remedies, a court of competent jurisdiction may enforce the duty of making and mailing or delivering the information and financial statements required by this section and, for good cause shown, extend the time therefor." The term " 'may' . . . is the traditional language of discretionary power." (*In re Providian Credit Card Cases* (2002) 96 Cal.App.4th 292, 299 (*Providian*).)

28

We review for abuse of discretion the trial court's judgment with respect to Dahlex's request for documents and information under section 17704.10. "If a decision involves the exercise of discretion by a trial court, a reviewing court will reverse that decision only if it concludes that the discretion was abused.  [Citations.]  'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason.' " (*Providian, supra*, 96 Cal.App.4th at p. 299.)

In reviewing the trial court's findings, the appellate court has " 'no power to judge [] the effect or value of the evidence, to weigh the evidence, to consider the credibility of the witnesses, or to resolve conflicts in the evidence or in the reasonable inferences that may be drawn therefrom.' " (*Leff v. Gunter* (1983) 33 Cal.3d 508, 518; *In re S.C.* (2006) 138 Cal.App.4th 396, 415 (*S.C.*); *In re Marriage of Martin* (1991) 229 Cal.App.3d 1196, 1200.)  " ' " '[I]t is the exclusive province of' " ' " the trial court " ' " 'to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends.' " ' " (*Lenk v. Total-Western, Inc.* (2001) 89 Cal.App.4th 959, 968.)  " 'Our inquiry "begins and ends with the determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the finding of fact." ' " (*San Diego Unified School Dist. v. Commission on Professional Competence* (2013) 214 Cal.App.4th 1120, 1142.)  "If such substantial evidence be found, it is of no consequence that the trial court believing other evidence, or drawing other reasonable inferences, might have reached a contrary conclusion." (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874, italics omitted (*Bowers*).)

29

2. Analysis

    a. For Purposes Reasonably Related

We first address Milestone's challenge to the trial court's finding that Dahlex made its request for a proper purpose.

To summarize the key dates and actions: In 2016, Dahlex invested $450,000 in Milestone. In March 2020, Ogen requested the withdrawal of Dahlex's investment. On July 15, 2020, Milestone began sending Dahlex payments reflecting its return on investment and partial capital redemptions. On February 22, 2021, Raab (a different Milestone member) requested withdrawal of the entirety of his $250,000 investment in Milestone. On April 22, 2021, Raab received a check from Milestone for the full amount of his investment plus interest. According to the "Dahlex Capital In & Out" and "Dahlex Capital Balance" (boldface & underscoring omitted) columns in the spreadsheet Milestone provided setting forth Dahlex's investments, withdrawals, and account balance, Milestone redeemed $140,000 of Dahlex's capital between July 2020, and May 2021. Milestone fully redeemed Raab's capital investment in Milestone prior to completing the redemption of Dahlex's capital investment in Milestone.

The Perrys have consistently stated their concern that Raab's investment was fully redeemed before Dahlex's, despite the "first come basis" redemption process set forth in the operating agreement and memorandum. The Perrys retained counsel after learning of Milestone's full redemption of Raab's investment prior to its full redemption of Dahlex's investment. Their counsel, Sagy, requested Milestone "[r]eport if other [m]embers submitted requests to withdraw prior to June 2, 2021, which request(s) remain unfulfilled" and "[i]n the event there are [m]embers with pending earlier requests for withdrawal, please provide a report outlining for each such

30

request, the withdrawal notice date, the amount sought, and the date Milestone anticipates to release the funds."

According to its operating agreement and memorandum, Milestone handles redemption requests on a "first come" basis, subject to "then existing cash flow, financial condition, and prospective real estate investments." According to its manager (Stuart), Milestone considers "fairness, dollars requested, dollars invested, cash flow considerations, financial conditions including property foreclosures, cash needs for repairs and general expenses, prospective loans and other considerations when making redemption decisions."

The trial court found that, to the extent redemption on a " 'first come basis' " is subject to the aforementioned factors, the Perrys "have a purpose reasonably related to their interests to understand Milestone's cash flow, financial condition and real estate investments at the time of their request." We decide substantial evidence in the record supports the court's finding and conclusion.

In addition, due to his concerns regarding Milestone's responses to the Perrys' requests to redeem Dahlex's capital investment, Ogen attested to examining Milestone's quarterly reports. He maintained that he discovered what he believed to be discrepancies in Milestone's reporting and questionable Milestone practices that could have resulted in the underpayment of investment returns to Dahlex. Ogen set forth in detail his concerns and open questions regarding Milestone's financial condition and practices, including the incorrect reporting of Dahlex's average daily balance of funds, payment of manager income in an amount greater than the sum of its members' investment returns, a potential shortfall in the anticipated returns for Dahlex and Dorit's Roth IRA account, and unexplained expenses.

31

The trial court found that the Perrys "established that there [were] sufficient open questions as to the rate of return on their investments relative to retention of profits and payment of management fees, and the increases in operating expenses and professional fees to establish a purpose reasonably related to their interests to support a request for documents and information." We conclude substantial evidence in the record supports the court's finding.

Although Milestone contends that Dahlex lacks a proper purpose for requesting Milestone's records based on Ogen's threat to report Milestone to the FBI and/or the SEC, the trial court found that "there [were] other, good cause purposes reasonably related to Dahlex's and [Dorit's Roth IRA account]'s interest" in Milestone's records. Given the substantial evidence in the record supporting Dahlex's stated reasons, particularly as balanced against the single threat, we are not persuaded by Milestone's argument.

Moreover, in finding Dahlex seeks Milestone's records for purposes reasonably related to its interests, the trial court impliedly credited the Perrys' assertions. We may not disturb credibility findings supported by substantial evidence on appeal. (*Hewlett-Packard Co. v. Oracle Corp.* (2021) 65 Cal.App.5th 506, 531–532.)

We decide the trial court did not abuse its discretion in finding that Dahlex sought the production and inspection of Milestone's records "for purposes reasonably related to" its interests.[21] Therefore, the trial court did

---

[21] In their appellate briefing, the Perrys additionally asserted as a justification for the production of the member names that the names are their "only tool for tracking" redemption requests and payments. But the Perrys do not cite to any evidence in the record to support their claim. When an appellant asserts a point on appeal " 'but fails to support it with reasoned argument and citations to authority' " (*Nelson v. Avondale Homeowners Assn.*

not err in ordering disclosure of Milestone's records under section 17704.10, subdivisions (a) and (b).

### b. Audited Reports

We next turn to the Perrys' challenge in the cross-appeal that the trial court erred in declining to order Milestone to provide financial records that were either audited or signed by an accountant. Amongst the records Dahlex sought from Milestone are audited or accountant-signed copies of: (1) Milestone's federal, state, and local income tax or information returns and reports for the six most recent fiscal years; (2) Milestone's financial statement for the six most recent fiscal years; and (3) Milestone's books and records "as they relate to the internal affairs of" Milestone for the current and past four fiscal years, namely, Milestone's profit and loss statements, balance sheets, cash flow analyses, summaries, and projections for the past six years, as well as records of all capital redemptions requested by any Milestone member.

In the writ order, the trial court acknowledged Dahlex's request "that documents be audited or signed by accountants." It stated that it was "not aware of any authority for such a requirement, nor did [the Perrys] provide any such authority," and, thus, declined to include such a requirement in the writ order.

In their cross-appeal, the Perrys contend that section 17704.10, subdivision (c) "expressly requires the provision of audited reports," and ask this court to direct the trial court to revise the writ order "to reflect Milestone's obligation to produce[] audited reports of financial statements, *to the extent available*." (Italics added.)

---

(2009) 172 Cal.App.4th 857, 862) or with appropriate record citations (*In re Marriage of Fink* (1979) 25 Cal.3d 877, 887), this court may treat the point as forfeited. We decide the Perrys forfeited this argument and have not considered it in our analysis.

It does not appear that the Perrys made this argument in the trial court. According to the writ order, Dahlex requested only that the enumerated documents "be audited or signed by accountants," and did not request audited documents "to the extent available." Nevertheless, "when an appeal raises a question of law on undisputed facts, the issue has not been forfeited." (*Winchester Mystery House, LLC v. Global Asylum, Inc.* (2012) 210 Cal.App.4th 579, 594; *Araiza v. Younkin* (2010) 188 Cal.App.4th 1120, 1127.) The issue raised by the Perrys is a pure question of law that does not depend on the facts before us.

The Act provides that "[t]he financial statements referenced in [] section [17704.10] shall be accompanied by the report thereon, *if any*, of the independent accountants engaged by the limited liability company or, if there is no report, the certificate of the manager of the limited liability company that the financial statements were prepared without audit from the books and records of the limited liability company." (§ 17704.10, subd. (c)(3), italics added.) Under section 17704.10, subdivision (a), the documents a member can request include those set forth in section 17701.13, subdivision (d)(1), (2), and (4). Under section 17704.10, subdivision (b)(1), members can inspect and copy records the limited liability company is required to maintain under section 17701.13. The sole reference to financial statements in section 17701.13 of the Act is in subdivision (d)(6), which requires limited liability companies to maintain "[c]opies of the financial statement of the limited liability company, if any, for the six most recent fiscal years."

As the Perrys appear to acknowledge in their briefing on cross-appeal, the language of the statute only requires the provision of audited *financial statements* if they exist. (§ 17704.10, subd. (c)(3).) The Act does not require the limited liability company to provide audited federal, state, and local

34

income tax or information returns and reports, nor does it require the limited liability company to provide audited copies of any of the books or records Dahlex seeks.

The trial court did not address section 17704.10, subdivision (c)(3) in the writ order. Under the plain language of the Act, Milestone is required to provide its "financial statements . . . accompanied by the report thereon, if any, of the independent accountants engaged by [Milestone] or, if there is no report, the certificate of [Milestone's manager] that the financial statements were prepared without audit from [Milestone's] books and records." (*Ibid.*) The trial court erred in omitting this requirement.

We therefore will direct the trial court to amend its writ order and judgment to state that Milestone is ordered to provide the information (in hardcopy or readable electronic form) required to be maintained in section 17701.13, subdivision (d)(6), namely, Milestone's financial statements, accompanied by the report or certificate, as applicable, specified in section 17704.10, subdivision (c)(3).

## C. Trade Secrets

### 1. Factual and Legal Background

#### a. Arguments on Appeal

All parties argue the trial court erred in its finding that the member list (but only the member list) must be redacted prior to production because it is a trade secret. Milestone contends that the writ order should be amended to require the redaction of member names and addresses from all documents ordered produced because the member names and addresses themselves, separate from the member list, are trade secrets. On cross-appeal, the Perrys challenge the requirement in the writ order that the member names and addresses be redacted from the member list because they contend that

Milestone's member list is not a trade secret and the Act and the operating agreement permit members to obtain " 'all' " records and such right cannot be "waived."

b. Operating Agreement

Under paragraph 6.1(a) of the operating agreement, Milestone agrees to maintain "such books, records and other materials as are reasonably necessary to document and account for its activities, including without limitation, those required to be maintained by the Act."[22]

Members and their representatives are entitled to "reasonable access to, and may inspect and copy, all books, records and other materials pertaining to [Milestone] or its activities."  Members and the manager are prohibited from disclosing "any information relating to [Milestone] or its activities to any unauthorized person or us[ing] any such information for his or her or any other [p]erson's personal gain."  Under paragraph 3.6 of the operating agreement, in the event of dissociation of a member, that member's "right to . . . receive information concerning [Milestone]'s affairs and inspect [Milestone]'s books and records will terminate."

c. Legal Principles

A trade secret is "information, including a formula, pattern, compilation, program, device, method, technique, or process that:  [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic

---

[22] The operating agreement defines the "Act" as the California Limited Liability Company Act.  The California Revised Uniform Limited Liability Company Act (§§ 17701.01–17713.13) became operative on January 1, 2014, prior to the execution of the operating agreement by Dahlex and Dorit's Roth IRA Account.  References in this opinion to "the Act" are to the California Revised Uniform Limited Liability Company Act.

value from its disclosure or use; and [¶] (2) [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (Civ. Code, § 3426.1, subd. (d).) Whether information constitutes a trade secret is generally treated as a factual issue. (*Global Protein Products, Inc. v. Le* (2019) 42 Cal.App.5th 352, 367; *Providian, supra*, 96 Cal.App.4th at p. 300.) Where there is a disputed factual issue regarding whether material is a trade secret, we review the trial court's determination using the substantial evidence standard. (*Providian*, at p. 301; *Morlife, Inc. v. Perry* (1997) 56 Cal.App.4th 1514, 1521 (*Morlife*); *Vacco Industries, Inc. v. Van Den Berg* (1992) 5 Cal.App.4th 34, 50.)

2. <u>Analysis</u>

a. The Member List is a Trade Secret and Redaction is Appropriate

The member list Milestone is required to maintain pursuant to section 17701.13, subdivision (d)(1) is "information, including a . . . compilation" (Civ. Code, § 3426.1, subd. (d)), because it consists of the names, addresses, contribution, and share in profits and losses of each member of the limited liability company.

"With respect to the general availability of customer information, courts are reluctant to protect customer lists to the extent they embody information which is 'readily ascertainable' through public sources, such as business directories. [Citation.] On the other hand, where the employer has expended time and effort identifying customers with particular needs or characteristics, courts will prohibit former employees from using this information to capture a share of the market. Such lists are to be distinguished from mere identities and locations of customers where anyone could easily identify the entities as potential customers. [Citations.] As a

general principle, the more difficult information is to obtain, and the more time and resources expended by an employer in gathering it, the more likely a court will find such information constitutes a trade secret." (*Morlife*, *supra*, 56 Cal.App.4th at pp. 1521–1522; see also *ReadyLink Healthcare v. Cotton* (2005) 126 Cal.App.4th 1006, 1019 ["[T]he [Uniform Trade Secrets Act] and case law 'establish that a customer list procured by substantial time, effort, and expense is a protectable trade secret.' "].)

The record contains substantial evidence in support of the trial court's finding that the Milestone member list is a trade secret. Stuart invested "time, money and effort to find the people willing to" invest in Milestone, including "thousands of hours" engaged in marketing, advertising, and soliciting potential members to make "this unique investment." (See *Morlife*, *supra*, 56 Cal.App.4th at p. 1522.) The Perrys do not dispute this finding. In addition, Milestone asserted that the member list is not publicly available, and it limits access to the list to those with "a need to know."

The Perrys contend that Milestone's member list is not a trade secret because production of the unredacted member list would not disclose it to the public, only to the Perrys, who, as Milestone members, are subject to general confidentiality obligations under the operating agreement. Specifically, paragraph 6.1(c) of the operating agreement prohibits Milestone's members from "disclos[ing] any information relating to [Milestone] or its activities to any unauthorized person or us[ing] any such information for his or her or any other [p]erson's personal gain."

We decide the terms of the operating agreement do not defeat characterization of the member list as a trade secret. These terms in the operating agreement support the trial court's conclusion that the member list "[i]s the subject of efforts that are reasonable under the circumstances to

maintain its secrecy." (Civ. Code, § 3426.1, subd. (d)(2).) Further, the Perrys do not meaningfully challenge the trial court's finding that the member list "[d]erives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use." (*Id.*, subd. (d)(1).) Finally, it is not clear the extent to which Ogen and Dorit are bound by the confidentiality provisions in the operating agreements signed by Dahlex and Dorit's Roth IRA account. We conclude substantial evidence in the record supports the trial court's finding that Milestone's member list is a trade secret.

In the alternative, the Perrys maintain that, even if Milestone's member list is a trade secret, requiring redaction of the member names and addresses from the member list contravenes their rights under section 17704.10 as well as their rights under the operating agreement to access " 'all' " records. In support of their argument, the Perrys rely on section 17704.10, subdivision (h), which states that "[a]ny waiver of the rights provided in [] section [17704.10] shall be unenforceable."

We reject the Perrys' reliance on section 17704.10, subdivision (h). The issue the Perrys raise is one of conflicting statutory provisions, not one of waiver. In essence, the Perrys contend that the trade secret protection provided by Civil Code section 3426.1 conflicts with section 17704.10.

"When interpreting conflicting statutes that cannot be reconciled, later enactments supersede earlier ones, and more specific provisions take precedence over more general ones." (*Chavez v. California Collision, LLC* (2024) 107 Cal.App.5th 298, 306; *Collection Bureau of San Jose v. Rumsey* (2000) 24 Cal.4th 301, 310.) However, "when these two rules are in conflict, the rule that specific provisions take precedence over more general ones trumps the rule that later-enacted statutes have precedence." (*State Dept. of*

*Public Health v. Superior Court* (2015) 60 Cal.4th 940, 960; see also *People v. Gilbert* (1969) 1 Cal.3d 475, 479, superseded on another ground by legislative amendment to Welf. & Inst. Code, § 11482 [Stats. 1984, ch. 1448, § 4.) "To the extent a specific statute is inconsistent with a general statute potentially covering the same subject matter, the specific statute must be read as an exception to the more general statute." (*Salazar v. Eastin* (1995) 9 Cal.4th 836, 857.)

Trade secrets are a protected subset of business information. (See *Altavion, Inc. v. Konica Minolta Systems Laboratory, Inc.* (2014) 226 Cal.App.4th 26, 53 [" '[A] trade secret may consist of any formula, pattern, device or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.' "]; *Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 564 [noting the Restatement (Third) of Unfair Competition "defines a trade secret as business or technical information 'that is sufficiently valuable and secret to afford an actual or potential economic advantage over others' "].) The Uniform Trade Secrets Act, despite being enacted before the California Revised Uniform Limited Liability Company Act, is the more specific statute.

We decide as a matter of statutory interpretation that the protection of the member list as a trade secret under Civil Code, section 3426.1 takes precedence over Dahlex's right to obtain a copy of the member list under sections 17704.10, subdivision (a) and 17701.13, subdivision (d)(1). Therefore, the trial court did not err in declining on these facts to order Milestone to provide an unredacted member list under section 17704.10.

## b. The Trial Court Did Not Err in Declining to Order Redaction of Other Documents

The trial court found that "Milestone's client list is protected as a trade secret under Civil Code section 3426.1." The court did not find that the individual member names and addresses in the list are trade secrets. Milestone argues that we should remand and direct the trial court to require the redaction of member names and addresses for all the records ordered produced. We disagree.

Because the court found Dahlex has a proper purpose for requesting Milestone's records, Milestone has a presumptive obligation to provide Dahlex with a list of Milestone's members, including their names, addresses, and contribution to and share in Milestone. (§ 17701.13, subd. (d)(1).) Milestone thus bore the burden of demonstrating to the court that its obligation should be limited. Milestone proffered evidence and legal authority before the trial court in support of its argument that its member list is a trade secret and should be protected, which the court found persuasive, resulting in its order to redact names and addresses from the member list. However, Milestone did not cite to any evidence or legal authority in support of its argument that the court should also require the redaction of member names, addresses, and other identifying information from all other records the court ordered disclosed. By issuing its judgment without the requested additional limitations on disclosure, the court impliedly determined that Milestone had not met its burden of proof with respect to its argument that the court should expand its redaction order.

"We are bound by the fundamental appellate rule that the judgment of the lower court is presumed correct and that all intendments and presumptions will be indulged in favor of its correctness. [Citation.] The appellant has the burden to overcome that presumption and show reversible

error.  [Citation.]  Where, as here, the issue on appeal turns on a failure of proof, the question for a reviewing court is whether the evidence compels a finding in favor of the appellant as a matter of law, i.e., whether the evidence was ' " 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " ' " (*Fowler v. Golden Pacific Bancorp, Inc.* (2022) 80 Cal.App.5th 205, 225–226.)

Like Milestone's assertions before the trial court, its argument on appeal lacks supporting citations to evidence in the record and legal authority.  We thus may treat its argument as forfeited.  (*S.C.*, *supra*, 138 Cal.App.4th at p. 408.)

Even if we were to consider Milestone's argument, here, as in the trial court, Milestone fails to identify evidence indicating that the member list (which itself is the trade secret) is duplicated in any of the other records the court ordered Milestone to provide to Dahlex.  Moreover, Milestone has not developed any cogent argument that the names and addresses that appear on documents other than the member list are not publicly known, "[d]erive[] independent economic value . . . from not being generally known to the public," and are "the subject of efforts that are reasonable under the circumstances to maintain [their] secrecy."  (Civ. Code, § 3426.1, subd. (d).)

Our courts have recognized a distinction between information that is publicly available and that which is not, oftentimes distinguishing between a curated list and the publicly available names contained therein.  (See, e.g., *Courtesy Temporary Service, Inc. v. Camacho* (1990) 222 Cal.App.3d 1278, 1288 ["[E]ven if the customers' names could be found in telephone or trade directories, such public sources ' "would not disclose the persons who ultimately made up the list of plaintiff's customers." ' [Citation.]  It is the list of persons who actually purchase [the company]'s services that constitute

42

confidential information."]; *American Paper & Packaging Products, Inc. v. Kirgan* (1986) 183 Cal.App.3d 1318, 1326; *Cypress Semiconductor Corp. v. Maxim Integrated Products, Inc.* (2015) 236 Cal.App.4th 243, 255.) Although we agree with the trial court that Milestone's member list is not publicly known, Milestone has not demonstrated with any evidence in the record that the member names and addresses on their own are not publicly known or otherwise ascertainable from publicly available sources. (See, e.g., *American Paper*, at p. 1326; *Cypress Semiconductor*, at p. 255 [noting information is not a trade secret when it is available from public sources, including those that "anyone with the appropriate subscription [could] find and peruse"].) We conclude on this record that the trial court did not err in declining to require the redaction of member names and addresses for all the records ordered produced.

### D. Attorney Fees and Costs

In their appeal of the fee order, the Perrys assert that the trial court abused its discretion because it did not question the Perrys' counsel's billing records, yet reduced the requested amount of attorney fees without any explanation other than criticizing the length and clarity of some of their briefs.[23] They argue that apportionment was unfounded because they sought section 17704.10 information generally, not specific categories of information, and yet the trial court "expressly limited its ruling to those issues where

---

[23] The Perrys contend that, because a different bench officer conducted earlier hearings in the writ proceedings and "the trial judge did not issue the [f]ee [order]," this court " 'may exercise [" ']somewhat more latitude in determining whether there has been an abuse of discretion than would be true in the usual case.[' "] ' " (Quoting *Center for Biological Diversity v. County of San Bernardino* (2010) 188 Cal.App.4th 603, 616.) We are unpersuaded, given that the same bench officer issued both the writ order and the fee order. (See *ante*, fn. 14.)

Milestone's refusal to comply was without justification, identifying two categories of information as justified and the balance as unjustified." In addition, the Perrys maintain that the trial court overlooked "detailed declarations and invoices" when the court reduced the costs awarded on the basis that it " 'was unable to identify the nature of those costs.' "

Milestone disagrees with the Perrys' contentions.

In its cross-appeal, Milestone asserts that the court erred because, to find that Milestone was unjustified in withholding the requesting documents, the court was required to make findings in the fee order that Milestone "had been presented with evidence of 'reasonably related purpose' for the requested records" before the Perrys filed their petition, which the court failed to do.

The Perrys respond that the burden was on Milestone to establish that its failure to accede to the request and its resulting noncompliance with section 17704.10 was justified. They argue that the trial court articulated its reasons for the award, even though it was not required to do so.

1. Legal Principles

Under section 17704.10, subdivision (g), if a trial court "finds the failure of the limited liability company to comply with the requirements of this section is without justification, the court may award an amount sufficient to reimburse the person bringing the action for the reasonable expenses incurred by that person, including attorney's fees, in connection with the action or proceeding."

"[T]he fee setting inquiry in California ordinarily begins with the 'lodestar,' i.e., the number of hours reasonably expended multiplied by the reasonable hourly rate," which is the prevailing hourly rate in the applicable community for similar legal work. (*PLCM Group v. Drexler* (2000) 22 Cal.4th

44

1084, 1095 (*PLCM*).) "Nevertheless, a trial court is not obligated to use the lodestar method" (*Roe v. Halbig* (2018) 29 Cal.App.5th 286, 310 (*Halbig*)), provided it begins with a calculation based on "the total number of hours counsel have actually spent on the case." (*Id.* at p. 311; *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 395 (*Horsford*) ["The basis for the trial court's calculation must be the actual hours counsel has devoted to the case."].)

Trial courts may adjust the lodestar figure "based on consideration of factors specific to the case, in order to fix the fee at the fair market value for the legal services provided." (*PLCM*, *supra*, 22 Cal.4th at p. 1095.) Such factors may include " 'the nature of the litigation, its difficulty, the amount involved, the skill required in its handling, the skill employed, the attention given, the success or failure, and other circumstances in the case.' " (*Id.* at p. 1096; see also *LCPFV, LLC v. Somatdary Inc.* (2024) 106 Cal.App.5th 743, 759 (*LCPFV*); *Ketchum v. Moses* (2001) 24 Cal.4th 1122, 1132 (*Ketchum*); *Horsford*, *supra*, 132 Cal.App.4th at p. 395 [holding the court may reduce the hours incurred by the attorneys by the number of hours "result[ing] from inefficient or duplicative use of time"].) However, " '[t]here is no hard-and-fast rule limiting the factors that may justify an exercise of judicial discretion to increase or decrease a lodestar calculation.' [Citation.] There are numerous such factors, and their evaluation is entrusted to a trial court's sound discretion; any one of those factors may be responsible for enhancing or reducing the lodestar." (*Krumme v. Mercury Ins. Co.* (2004) 123 Cal.App.4th 924, 947.)

" 'It is well established that the determination of what constitutes reasonable attorney fees is committed to the discretion of the trial court . . . . [Citations.] The value of legal services performed in a case is a matter in

45

which the trial court has its own expertise.' " (*PLCM, supra*, 22 Cal.4th at p. 1096.) "An experienced trial judge is in the best position to evaluate the value of professional services rendered in the trial court. [Citation.] Trial judges of experience, like this one, regularly see fee applications and develop a current and data-based sense of what is customary and reasonable. [¶] We owe considerable deference to trial court decisionmaking about attorney fee awards." (*LCPFV, supra*, 106 Cal.App.5th at p. 759; *Ketchum, supra*, 24 Cal.4th at p. 1132.)

We review the trial court's determination on the amount of fees and costs for abuse of discretion. (*LNSU #1, LLC v. Alta Del Mar Coastal Collection Community Assn.* (2023) 94 Cal.App.5th 1050, 1081, citing *Mountain Air Enterprises, LLC v. Sundowner Towers, LLC* (2017) 3 Cal.5th 744, 751.) The discretionary language used in section 17704.10, subdivision (g) suggests that the Act likewise anticipates that courts will review for abuse of discretion any challenged attorney fee and costs orders issued pursuant to the statute. (See *Ellis v. Toshiba America Information Systems, Inc.* (2013) 218 Cal.App.4th 853, 882.)

While deferential, " ' " [t]he abuse of discretion standard . . . "is not empty." ' " ' " (*Gonzalez v. Santa Clara County Dept. of Social Services* (2017) 9 Cal.App.5th 162, 169.) "A trial court's award of attorney fees must be able to be rationalized to be affirmed on appeal. . . . When a trial court makes an award that is inscrutable to the parties involved in the case, and there is no apparent reasonable basis for the award in the record, the award itself is evidence that it resulted from an arbitrary determination. It is not the absence of an explanation by the trial court that calls the award . . . into question, but its inability to be explained." (*Gorman v. Tassajara Development Corp.* (2009) 178 Cal.App.4th 44, 101 (*Gorman*).)

"We presume the fee approved by the trial court is reasonable and the court considered all factors in reaching its decision, even though the court may not have mentioned them in a written ruling. The trial court is not required to state each charge it finds reasonable or unreasonable, nor is it required to issue a statement of decision with regard to a fee award. [Citation.] [¶] We will not disturb the trial court's judgment unless it is clearly wrong. We have no authority to disturb the trial court's factual findings if they are supported by substantial evidence. The burden is on the objector to show error." (*LCPFV*, *supra*, 106 Cal.App.5th at p. 759; *Ketchum*, *supra*, 24 Cal.4th at p. 1132; *Collins v. City of Los Angeles* (2012) 205 Cal.App.4th 140, 153.)

2. <u>Analysis</u>

a. Section 17704.10, subdivision (g)

Milestone contends the trial court erred by failing to make a finding in the fee order that Milestone had been presented with a reasonably related purpose before the Perrys filed their petition and then find that Milestone's refusal to provide the records was "without justification *when it was first made*." (Italics added.) We are not persuaded.

Section 17704.10, subdivision (g) requires only that the court find "the failure of the limited liability company to comply with the requirements of this section is without justification," which the trial court did here. The trial court found that Milestone "acted without justification on some issues," namely, "in opposing the production of the other records and information sought." It identified the specific records Milestone was justified in withholding and, by implication, those it was not justified in withholding. Section 17704.10, subdivision (g) does not require a finding that failure to comply with the statute is without justification when the request "was first

47

made." We decide the trial court was cognizant of and applied the correct standard under section 17704.10, subdivision (g) and did not err when it found the Perrys were entitled to attorney fees and costs.

### b. Calculating Award of Attorney Fees and Costs

The trial court began its analysis of the Perrys' motion for attorney fees and costs with the amounts requested by the Perrys, specifically, attorney fees totaling $181,327.50 and costs totaling $11,008.64 that Sagy's law firm billed Dahlex.

With respect to the requested attorney fees, the trial court considered various factors in favor of the Perrys, finding that "the nature of the litigation was of average difficulty and intricacy," the Perrys' attorneys were "experienced and have the skills necessary for the litigation," their billing rate ($450 per hour) was reasonable, and their use of incurred but uncharged hours was likewise reasonable. The court also considered factors in favor of reducing the lodestar. It cited as an example of unreasonable billing the Perrys' "unnecessarily lengthy" and unclear pleadings. The court also considered the fact that the amended petition was granted in part and denied in part, and its finding that Milestone was justified in its refusal to produce some documents but unjustified in its failure to comply with its obligation to produce the other records and information the Perrys sought. It reduced the attorney fee award from $181,327.50 to $65,000 on the foregoing grounds.

With respect to the requested costs, the trial court cited as grounds for reducing the cost award the inclusion of unspecified filing and motion fees; a charge for " '[c]ourt ordered transcripts' " despite the absence of reported proceedings "for any of the appearances in this case"; and unspecified legal research charges under the broad category " '[o]ther.' " The court expressly excluded from the cost award those costs that were unspecified and

unwarranted, limiting the award to those costs that could "be established"—namely, $466.16 for the cost of filing the petition and $60 for filing fees for the motion for attorney fees and costs—and $175.02 in process service fees that were not challenged by Milestone.

As discussed *ante*, substantial evidence in the record supported the trial court's findings that Dahlex's section 17704.10 request was reasonably related to its interests in its investments in Milestone and the Milestone member list is a trade secret.

With respect to the attorney fees, the trial court stated that, in its view, the Perrys' counsel submitted "unnecessarily lengthy" and unclear pleadings. which the court was entitled to conclude based on its experience. (See *Walent v. Commission on Professional Competence etc.* (2017) 9 Cal.App.5th 745, 748–749.) Although the trial court did not specify each line item in Sagy's bills that it found unsupported or unreasonable, thus meriting a reduction in the attorney fee award, "[i]n awarding attorney fees in a lesser amount than requested, trial courts are not required to specify each and every claimed item found to be unsupported or unreasonable." (*Gorman*, *supra*, 178 Cal.App.4th at p. 67; *id*. at p. 101.)

Nevertheless, even if we apply all presumptions in favor of the trial court's determination, on the record before us, we cannot ascertain how the court arrived at its award of $65,000 in attorney fees for over 400 hours of attorney time. "Because we cannot determine how the trial court arrived at the attorney fees it awarded, we cannot assess whether the trial court properly exercised its discretion." (*Halbig*, *supra*, 29 Cal.App.5th at p. 312.) " 'More detailed findings are essential to permit meaningful review of the award' " issued here. (*In re Vitamin Cases* (2003) 110 Cal.App.4th 1041, 1053 (*Vitamin Cases*).)

49

"When the record is unclear whether the trial court's award of attorney fees is consistent with the applicable legal principles, we may reverse the award and remand the case to the trial court for further consideration and amplification of its reasoning." (*Vitamin Cases*, *supra*, 110 Cal.App.4th at p. 1052.) Therefore, while we agree with the trial court that the Perrys are entitled to attorney fees under section 17704.10, subdivision (g), we reverse the attorney fee award and remand to the trial court for further consideration and articulation of its reasons for reducing the award.

With respect to costs, the record reflects the unspecified and unwarranted costs the court cited as reasons for reducing the cost award. We affirm the trial court's award of costs.

### III. DISPOSITION

We remand the May 1, 2023 order to the trial court solely for the purpose of directing the trial court to amend the order and judgment to state that Milestone is ordered to provide the information (in hardcopy or readable electronic form) required to be maintained in Corporations Code section 17701.13, subdivision (d)(6) accompanied by the report or certificate, as applicable, specified in section 17704.10, subdivision (c)(3).

We reverse the January 31, 2024 order and remand that issue to the trial court for reconsideration of the calculation of attorney fees.

The judgment is otherwise affirmed. The parties shall bear their own costs on appeal. (Cal. Rules of Court, rule 8.278(a)(3).)

50

_____
Danner, J.

WE CONCUR:



_____
Grover, Acting P. J.




_____
Wilson, J.




H051093 - *Perry et al. v. Stuart et al.*
H051955 - *Dahlex LP et al. v. Milestone Financial LLP et al.*

| Trial Court: | Santa Clara County Superior Court |
| --- | --- |
| Trial Judge: | Hon. Julie A. Emede |
| Counsel for Plaintiffs and Appellants: | Sagy Law Associates and Rony Sagy |
| Counsel for Defendants and Appellants: | Miller Nash and Bernard Jaron Kornberg |

**H051093 -** *Perry et al. v. Stuart et al.*
**H051955 -** *Dahlex LP et al. v. Milestone Financial LLP et al.*